**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

-------------------------------------------------------------------

CHARLES ROANE,

         Plaintiff,

              v.

A&E TELEVISION NETWORKS, LLC,
SWIRL FILMS, LLC, and JOHN DOES 1-10,

         Defendants.

-------------------------------------------------------------------

Case No. 1:25-cv-5286-GHW

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION TO ENJOIN
THE DISTRIBUTION OF THE FILM _PRETTY HURTS_**

DAVIS WRIGHT TREMAINE LLP
Rachel F. Strom
Abigail Everdell
Alexandra Perloff-Giles
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Telephone:  (212) 603-6455
Fax:  (212) 489-8340
RachelStrom@dwt.com
AbigailEverdell@dwt.com
AlexandraPerloffGiles@dwt.com

_Counsel for Defendants_

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

I.     THE GOSSERAND/ROANE AGREEMENT .................................................. 3

II.    THE SWIRL/GOSSERAND AGREEMENT ................................................... 4

III.   PRETTY HURTS ........................................................................................ 6

IV.   MR. ROANE'S LEGAL THREATS .............................................................. 7

V.    MARKETING OF *PRETTY HURTS* ............................................................ 8

VI.   THIS LAWSUIT ...................................................................................... 10

ARGUMENT ..................................................................................................... 10

I.     THE PRELIMINARY INJUNCTION PLAINTIFF SEEKS IS A
CLASSIC UNCONSTITUTIONAL PRIOR RESTRAINT ............................... 11

II.    PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS FOR A
PRELIMINARY INJUNCTION ................................................................ 14

      A.    Plaintiff Cannot Establish A Likelihood Of Success On The Merits ................... 15

      B.    Plaintiff Cannot Demonstrate Irreparable Injury ................................... 19

      C.    The Balance of Hardships Weighs Heavily In Favor of Defendants ................... 20

      D.    The Public Interest Strongly Favors Defendants ................................... 22

CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.M.P. v. Hubbard Broad., Inc.*,
216 F. Supp. 2d 933 (D. Minn. 2001) ...................................................................................14

*Alexander v. United States*,
509 U.S. 544 (1993) .................................................................................................................1

*Amable v. New Sch.*,
2022 WL 1443352 (S.D.N.Y. May 6, 2022) ........................................................................18

*People ex rel. Arcara v. Cloud Books, Inc.*,
68 N.Y.2d 553 (1986) ...........................................................................................................12

*Arenas v. Shed Media U.S. Inc.*,
881 F. Supp. 2d 1181 (C.D. Cal. 2011) ...............................................................................21

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ................................................................................................................11

*Brown v. TV One*,
Case No. 17-CV-6824 (S.D.N.Y.) ............................................................................2, 13, 17

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011) ...........................................................................................14, 15

*CBS Inc. v. Davis*,
510 U.S. 1315 (1994) ............................................................................................................13

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990) ..................................................................................................13

*Columbia Broad. Sys., Inc. v. U.S. Dist. Court for Cent. Dist. of California*,
729 F.2d 1174 (9th Cir. 1984) .........................................................................................13, 20

*Diaz v. NBC Universal, Inc.*,
536 F. Supp. 2d 337 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009) .....................13

*Elrod v. Burns*,
427 U.S. 347 (1976) ..........................................................................................................2, 21

*English v. Danone N. Am. Pub. Benefit Corp.*,
678 F. Supp. 3d 529 (S.D.N.Y. 2023) ..................................................................................18

*Eyal R.D. Corp. v. Jewelex N.Y. Ltd.*,
    784 F. Supp. 2d 441 (S.D.N.Y. 2011)....................................................................16

*Goldblum v. Nat'l Broad. Corp.*,
    584 F.2d 904 (9th Cir. 1978) .............................................................................13

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)..........................................................................................21

*Hassan v. Fordham University*,
    533 F. Supp. 3d 164 (S.D.N.Y. 2021)...................................................................18

*Herrick v. Grindr, LLC*,
    2017 WL 744605 (S.D.N.Y. Feb. 24, 2017).........................................................15

*Horowitz v. Spark Energy, Inc.*,
    2020 WL 4917180 (S.D.N.Y. Aug. 21, 2020) ......................................................16

*Insurance Co. of the State of Pennsylvania v. Lakeshore Toltest JV, LLC*,
    2015 WL 8488579 (S.D.N.Y. Nov. 30, 2015) ......................................................20

*Jeffrey Milstein v. Greger, Lawlor, Roth Inc.*,
    58 F.3d 27 (2d Cir. 1995)..................................................................................16

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004).................................................................19

*Jordan v. Metro. Life Ins. Co.*,
    280 F. Supp. 2d 104 (S.D.N.Y. 2003)..................................................................13

*In re King World Prods., Inc.*,
    898 F.2d 56 (6th Cir. 1990) .........................................................................13, 20

*LaChapelle v. Fenty*,
    812 F. Supp. 2d 434 (S.D.N.Y. 2011).................................................................17

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996) ......................................................................................16

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006).............................................................................21

*Meador v. New Times, Inc.*,
    36 F.3d 1103 (9th Cir. 1994) ...........................................................................13

*Metro. Opera Ass'n v. Local 100*,
    239 F.3d 172 (2d Cir. 2001).............................................................................19

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1979) ........................................................................................... 12

*Morrissey v. A&E Television Networks, LLC*,
    Case No. 2024-01107 (1st Dep't) ....................................................................... 13

*In re Mid-Island Hosp., Inc.*,
    276 F.3d 123 (2d Cir. 2002) ............................................................................... 18

*Near v. Minnesota*,
    283 U.S. 697 (1931) ........................................................................................... 12

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ........................................................................................ 1, 11

*New Era Publ'ns Int'l v. Henry Holt & Co.*,
    695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989) .............. 13

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) .................................................................................. 1, 11, 12

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ........................................................................................... 13

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) ............................................................................................... 22

*Paramount Film Distr. Corp. v. State*,
    30 N.Y.2d 415 (1972) ........................................................................................ 18

*Pirone v. MacMillan, Inc.*,
    894 F.2d 579 (2d Cir. 1990) ............................................................................... 15

*Porco v. Lifetime Entm't Servs., LLC*,
    116 A.D.3d 1264 (3d Dep't 2014) ................................................................. 13, 19

*In re Providence Journal Co.*,
    820 F.2d 1342 (1st Cir. 1986) ....................................................................... 11, 13

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990) ............................................................................... 19

*Rosenfeld v. W.B. Saunders*,
    728 F. Supp. 236 (S.D.N.Y. 1990), *aff'd without op.*,
    923 F.2d 845 (2d Cir. 1990) ............................................................................... 19

*Telecom Int'l Am., Ltd. v. AT&T Corp.*,
    280 F.3d 175 (2d Cir. 2001) ............................................................................... 17

iv

*Tilton v. Capital Cities/ABC Inc.*,
    827 F. Supp. 674 (N.D. Okla. 1993) ........................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................14, 22

*Zoll v. Jordache Enterprises, Inc.*,
    2002 WL 31873461 (S.D.N.Y. Dec. 24, 2002) ......................................................15

**Statutes**

New York Civil Rights Law Section 51 ..........................................................................15

Defendants A&E Television Networks, LLC ("AETN") and Swirl Films, LLC ("Swirl Films"), by and through their undersigned attorneys, submit this memorandum of law in opposition to the motion of plaintiff Charles Roane ("Plaintiff" or "Mr. Roane") seeking a preliminary injunction to enjoin the distribution, promotion, or airing of the film *Pretty Hurts* (the "Film").

## PRELIMINARY STATEMENT

Just four days before the Film was set to premiere, Plaintiff asked this Court to grant one of the rarest forms of judicial relief—an unconstitutional prior restraint preventing Defendants from distributing and promoting a movie that highlights the importance of meningitis vaccines. Plaintiff does so although he has never seen the movie, or read the script for the movie, or alleged that there is anything whatsoever wrong with the actual content of the movie. Rather, he does so because he is a musical talent manager and believes his client (or former client, as she would say)—who appears in the movie for less than 15 minutes—should have sought his approval before agreeing to appear in the Film.

"[C]ourt orders . . . that actually forbid speech activities are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). They "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The United States Supreme Court has *never* upheld a prior restraint enjoining publication—not even with the publication of military secrets, *see N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (reversing injunction prohibiting publication of Pentagon Papers as prior restraint), or where countervailing constitutional rights were at stake, *see Neb. Press Ass'n*, 427 U.S. at 559 (in case where a defendant's Sixth Amendment rights were at issue, overturning preliminary injunction preventing publication of accounts of widely publicized murder). Plaintiff's claims here—based on Mr. Roane's belief

that his client should have sought his approval to appear in the Film—do not remotely present the kind of "exceptional case" that could overcome the First Amendment's protections for free speech.

Aside from Plaintiff's attempt to turn a third-party dispute between Plaintiff and his (former) client into a constitutional crisis, Plaintiff also has not met his burden of demonstrating each of the factors necessary to justify the harsh and drastic remedy of a preliminary injunction. Plaintiff cannot show that he is likely to succeed on the merits of his claims because all of his claims are barred by well-settled principles of law.  He cannot show that any alleged injury is irreparable for *him*.  Indeed, the injury here is to the Defendants and the public, as a prior restraint on speech both "unquestionably constitutes irreparable injury" to those enjoined and disserves the public interest.  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  The balance of hardships also favors Defendants because money damages would be adequate to compensate Plaintiff in the highly unlikely event he is ultimately successful in his claims.

Plaintiff alleges in his Complaint that this case is akin to *Brown v. TV One*, Case No. 17-CV-6824 (S.D.N.Y.), in which the musician Bobby Brown tried to enjoin a film that Defendant Swirl Films had also produced.  ECF No. 18 ¶ 22.  Plaintiff is entirely correct that the cases are similar.  There, as here, the plaintiff claimed to have contractual and publicity rights which, he believed, allowed him to prevent the distribution of the television film at issue.  But Judge Analisa Torres refused to enjoin the film in *Brown*, holding that doing so would be a restraint on speech and that the plaintiff was unlikely to succeed on his claims.  *See* Decl. of Rachel Strom ("Strom Decl."), Ex. A.  As in *Brown,* Plaintiff's request to enjoin the release of the Film should be denied.

## STATEMENT OF FACTS

### I.    THE GOSSERAND/ROANE AGREEMENT

On or about December 9, 2022, Haley Gosserand entered into a Production and Management Agreement with Plaintiff Charles Roane, a musical producer and talent representative for musical artists (the "Gosserand/Roane Agreement").  According to Section 1 of the Gosserand/Roane Agreement, which covers the Services and Scope, Ms. Gosserand retained Mr. Roane "as her producer and artist representative in connection with the presentation of Artist to record companies . . . for purposes of obtaining an exclusive artist recording agreement . . . for the benefit of [Ms. Gosserand] and Roane who will be granted, among other things, the right to distribute audio and audio-visual records . . . embodying master recordings . . . of Artist's performances."  ECF No. 18-1 at §§ 1.1.  Mr. Roane agreed to advise her in matters relating to her "professional career in all aspects of the music industry." *Id.* § 1.4.

The Gosserand/Roane Agreement provides that it shall begin on December 9, 2022 and terminate following the expiration of the Shopping Period, defined as either two years from the end of the Development Term[1] or when a recording agreement is executed, or upon 30 days' written notice by Ms. Gosserand.  *See id* §§ 3.1, 3.3, 3.4.  The parties then proceeded to execute two Amendments extending the Shopping Period to December 31, 2026.

The dispute between Mr. Roane and Ms. Gosserand underlying this lawsuit centers on two provisions of the Gosserand/Roane Agreement.  Section 2.1(c) provides:

> Roane is hereby authorized and empowered for Artist and on Artist's behalf, to do the following, upon Artist's written approval (text or email to suffice) which shall not be unreasonably withheld: . . . (c) Roane shall approve all televised musical performances.

---

[1] "Development Term" puzzlingly is defined to start on the execution date of the agreement—December 9, 2022—and to "continue through February 28, 2022." Gosserand/Roane Agreement § 3.1 (ECF No. 18-1).

*Id.* § 2.1. Section 4.3 provides:

> For avoidance of doubt, Artist shall be permitted to engage in any third-party agreement with respect to Artist's social media without the consent or involvement of Roane. This may include brand and endorsement deals. Artist shall also be permitted to agree to perform at any performance and make any public appearances at Artist's sole discretion except that all televised appearance shall be approved by Roane.

*Id.* § 4.3. Mr. Roane focuses on Section 4.3, providing that "all televised appearance shall be approved by Roane." ECF No. 18 ¶ 11; ECF No. 7-4 (June 4 letter from Mr. Roane). Ms. Gosserand contends that Section 4.3 must be read in connection with Section 2.1(c), arguing that Section 4.3's reference to "televised appearances" refers to the approval right over "televised musical performances" and "does not independently grant Mr. Roane control over non-musical roles." Declaration of Eric Tomosunas ("Tomosunas Decl."), Ex. 4 at 8 (June 4, 2025 Gosserand Termination). Neither Defendant is a party to the Gosserand/Roane Agreement, and neither Defendant had knowledge of Mr. Roane or of the Gosserand/Roane Agreement until a few weeks ago. *See, e.g.*, Tomosunas Decl. ¶ 15.

## II.    THE SWIRL/GOSSERAND AGREEMENT

Defendant Swirl Films, LLC is an independent film and television production company based in Atlanta, Georgia. Swirl Films created a single-purpose legal entity, TBP Films LLC ("TBP Films"), for purposes of producing the *Pretty Hurts* movie. TBP Films entered into an agreement with Ms. Gosserand for her participation in the Film, effective April 10, 2025 (the "Swirl/Gosserand Agreement"). *See* Tomosunas Decl. Ex. 2.

Ms. Gosserand agreed that TBP Films would be the exclusive owner of the Film and "have all the rights in and to the results and proceeds of [Ms. Gosserand's] services performed" pursuant to the agreement, as well as "the unlimited right throughout the world to exhibit" the Film. Tomosunas Decl. Ex. 2 at 2. The Swirl/Gosserand Agreement expressly incorporated "all the applicable provisions of the terms and conditions contained in the applicable SAG-AFTRA

4

Agreement for Independent Producers of Television Motion Picture" (the "SAG-AFTRA Agreement") appended to the Swirl/Gosserand Agreement. *Id.*

Section 6 of the SAG-AFTRA Agreement provides that the producer (TBP Films) "shall have the perpetual right to use and authorize others to use, throughout the universe and in all media, Artist's name, sobriquet, photograph, likeness, voice and biographical data" in connection with the development, production, exhibition, advertising, marketing, promotion, or other exploitation of the Film. *Id.* at 4.

Section 11 of the SAG-AFTRA Agreement provides that Ms. Gosserand "represents, warrants and agrees that" she "is free to enter into this Agreement and has not made, nor will make, any agreement, commitment, grant or assignment"; that TBP Films will not "be required to pay to or incur any sums on behalf of any person or entity due to [TBP Films'] ownership, acquisition, use or exploitation of" the material resulting from Ms. Gosserand's services; and that Ms. Gosserand "will indemnify [TBP Films] and its affiliated companies, licensees, successors and assigns" from any breach of Ms. Gosserand's representations, warranties, or agreements or for any tortious acts or omissions by Ms. Gosserand. *Id.* at 5.

TBP Films and Swirl Films relied on Ms. Gosserand's representations that she was free to participate in the *Pretty Hurts* project. Tomosunas Decl. ¶ 14. The vast majority of actors Swirl Films works with are represented by talent agents and/or managers, who typically receive a percentage of revenues from certain kinds of work by the talent. *Id.* ¶ 18. Those representatives are paid by the actors pursuant to the individual representation agreements; Swirl Films does not pay talent representatives directly or obtain the consent of talent representatives independent from the consent of the talent whom they represent. *Id.* And if actors have any issue with, or claim against, their agent, or vice versa, that is an issue that they work out between themselves;

Swirl Films does not mediate disputes between actors and their agents. *Id. ¶* 19. Swirl Films understood that Ms. Gosserand was represented for purposes of her acting career by Jason Lockhart at Atlanta Models & Talent, the same agent who also represented three other actors in the Film. *Id. ¶* 17.

### III.    PRETTY HURTS

In December 2024, Swirl Films began work on *Pretty Hurts*, a film about a mother and former beauty queen guiding her daughter through the toxic and cutthroat world of beauty pageants. As the mother and daughter are preoccupied with the pageant, the daughter's best friend falls seriously ill with meningitis, and the film raises awareness about the disease. *See* Tomosunas Decl. ¶ 4; *see also* Declaration of Maura O'Donovan ("O'Donovan Decl.") ¶ 3.

Ms. Gosserand is not the "star" of the Film. Tomosunas Decl. ¶ 6. She does not play the mother (Haylie Duff), the daughter (Sarah Borne), or the ill friend (Kaci Barker). *Id. ¶* 4. Rather, she is one of more than 20 actors in the cast. Ms. Gosserand does not appear in the front credits to the Film, and only appears fifth on the list of the end credits. *See* Tomosunas Decl. Ex. 1 (Film Credits). All told, she appears in the Film for approximately 12 minutes and 47 seconds, out of a total of approximately 88 minutes in the Film, and worked for 7 of the 14 days of the film shoot. Tomosunas Decl. ¶¶ 7-8. Ms. Gosserand's last day on set was April 22, 2025, and she received $10,639 for her work on the Film. *Id. ¶¶* 8, 10.

Swirl Films licensed the Film to Defendant AETN for distribution on AETN's Lifetime® network. Lifetime is a premier entertainment destination for women, offering high-quality original programming, scripted series, nonfiction series, and movies. O'Donovan Decl. ¶ 2. AETN received the final Film from Swirl Films on June 17, 2025. Tomosunas Decl. ¶ 27. The Film is scheduled to premiere on Lifetime at 8 p.m. ET on Saturday, June 28, 2025, will be re-

telecast on Sunday afternoon, June 29, and will be available through video-on-demand services starting June 29.

## IV.    MR. ROANE'S LEGAL THREATS

On June 4, 2025, Ms. Gosserand (through her counsel, Julian Cordero) wrote to Mr. Roane (through his counsel, Dayna Cooper), stating that the Gosserand/Roane Agreement had expired because the amendments to it failed to reflect any new consideration and are therefore void and unenforceable.  *See* Tomosunas Decl. Ex. 4 at 7.  The letter also purported to offer formal notice that the Gosserand/Roane Agreement was terminated, and cited a number of statements allegedly made by Mr. Roane threatening Ms. Gosserand and her career.  *Id.* at 7-8. Finally, the June 4 letter argued that, even assuming the Gosserand/Roane Agreement is still in effect, it does not give Mr. Roane "any authority over Ms. Gosserand's acting, television, or film career"; Mr. Roane had authority only over Ms. Gosserand's musical, not acting, career.  *Id.* at 8. The letter requested that Mr. Roane cease from contacting Netflix, Amazon, Lifetime, and other third parties associated with Ms. Gosserand's acting career and representing to those third parties that he holds approval rights or oversight with respect to her non-musical appearances.  *Id.* at 9.

That same day, after receiving Ms. Gosserand's letter, Mr. Roane's counsel wrote to AETN, arguing that Lifetime "material[ly] violat[ed] [] Roane's exclusive contractual rights" by "featuring Haley without Roane's required advanced consent."  ECF No. 18-4 at 1.

Since June 12, 2025, AETN has responded to Mr. Roane explaining that AETN had no knowledge of Mr. Roane's agreement with Ms. Gosserand, and that "[a]ny attempt to enjoin AETN's distribution would constitute an unconstitutional prior restraint under settled First Amendment doctrine."  ECF No. 18-5 at 1; ECF No. 18-7.  Also on June 23, counsel for Ms. Gosserand wrote Defendants, stating that "Mr. Roane has no authority over Ms. Gosserand's acting or television career. His music production agreement with her expired months ago and

was limited to music-related activities only.  Mr. Roane is now sending these letters to multiple parties in an apparent attempt to harass and interfere with Ms. Gosserand's legitimate professional opportunities."  Tomosunas Decl. Ex. 4 at 1.

## V.    MARKETING OF *PRETTY HURTS*

Both Swirl Films (and its subsidiary TBP Films) and AETN have put significant work into not only producing but also marketing and promoting *Pretty Hurts*.  Swirl had 15 members of its team working on the Film since December 2024, Tomosunas Decl. ¶ 26, and AETN has marketed the Film through a multiplatform promotional strategy, across digital, social, and linear platforms, which has been carefully planned to drive audiences to the June 28 premiere. O'Donovan Decl. ¶ 4.  The time and effort that AETN has invested in marketing *Pretty Hurts* has exceeded the typical investment for Lifetime programming.  *Id.*  For example, a premiere event for the Film, which alone cost around $100,000, was held in May 2025, with national press, influencers, and talent present.  *Id.* ¶ 5.  Materials for the event emphasized the Film's June 28 premiere date.  *Id.*  In addition, the Film has been advertised and marketed through numerous other channels for well over a month.  *Id.* ¶ 6.  The total media value of AETN's marketing plan was around $1,800,000.00.  *Id.* ¶ 8.  Press releases promoting the film, all listing the June 28 premiere date, have been issued.  *Id.* ¶ 6.  On-air promos citing the June 28 premiere date have run for weeks on Lifetime and the Lifetime Movie Network, for an estimated 57 million combined household impressions.  *Id.*  A billboard advertising the Film and its June 28 premiere date has been up in Times Square since Monday, June 23.  *Id.*  The Film is being promoted on the Lifetime website, with links to a landing page advertising the June 28 premiere date.  *Id.*  AETN has marketed the film extensively on social media, pointing viewers to the June 28 premiere date.  *Id.*  And press interviews—including one this week for which Haylie Duff was flown to California—have all been timed to create maximum impact for the June 28 premiere.

8

*Id. ¶* 7.  If the premiere date were changed, AETN would need to create and execute a new (and costly) marketing push around that new premiere date.

AETN distributes content for its various channels, including Lifetime®, through both a traditional linear model (i.e., when content is shown at a scheduled time on a given cable channel) and through video-on-demand ("VOD").  Declaration of Tiffany Cruz ("Cruz Decl.") ¶ 3; Declaration of William Pedlow ("Pedlow Decl.") ¶ 3.

With respect to linear, advertisements have been sold against the planned premiere date. O'Donovan Decl. *¶* 10.  AETN received advertising revenue for the Film at rates higher than the rates advertisers would pay to advertise in other replacement content.  *Id.*  If the Film cannot air on June 28, after the hearing in this case, AETN will not only have to prepare replacement programming on one day's notice, but also replace the planned advertising linked to the Film with new advertising not specifically linked to the Film and manually insert it at the right time intervals of the replacement content.  Pedlow Decl. ¶¶ 5-8.  Additionally, AETN would need to find a new prime-time time slot for the Film when it is permitted to air—a challenging task given that programming is often locked into prime-time slots well in advance.  *Id.* ¶ 7.

AETN would also need to cancel VOD distribution of the Film, through which it is distributed to online platforms for "Download to Own/Download to Rent" availability, as well as to cable operators to provide to their subscribers on demand.  Cruz Decl. ¶¶ 3, 6.  This encumbrance would require AETN teams to spend significant time and engage in extensive communications with online distribution platforms and cable affiliates who provide AETN content to audiences.  *Id*. ¶¶ 8-11.  It would also inevitably result in tangible harm to client relationships and a significant reduction in the anticipated VOD audience for the Film.  *Id*.

AETN is not the only one that would be harmed by a delay to the Film's release. From Swirl Films' perspective, the partnership with a major television network like AETN, which is comprised of popular and culturally-relevant media brands like Lifetime®, A&E®, and The HISTORY® Channel, is very valuable. Tomosunas Decl. ¶ 28. As noted, at least 15 members of Swirl Films' team worked on the Film for seven months, in addition to approximately 100 crew members who worked on the film for roughly 3-4 months. *Id.* ¶ 26. Swirl Films provided AETN with a finished copy of the Film on June 17, 2025. Tomosunas Decl. ¶ 27. Delays with the Film release date would harm the trust that AETN has placed in Swirl Films by licensing *Pretty Hurts*—and the trust that viewers place in Swirl Films (and AETN) to deliver the promised content.

## VI.    THIS LAWSUIT

Three weeks after first asserting his claims to the defendants, and late the evening of June 24, 2025, Mr. Roane filed this lawsuit and sought a temporary restraining order and preliminary injunction to stop Defendants from releasing the Film *Pretty Hurts* as scheduled. *See* ECF Nos. 6 & 7. On June 25, 2025, Mr. Roane filed an amended complaint. *See* ECF No. 18.

## ARGUMENT

Plaintiff Roane, who has *no* contract with either of the Defendants here, wants to enjoin a movie that took months of work to create and millions of dollars to produce and promote because he feels his client had to get his approval before she appeared in it. He seems to believe that an allegedly breached management contract is grounds to enjoin *non-parties* to that contract who produced editorial work with the participation of one of the parties. There is not a case in the country that supports this proposition because it is not only blatantly unconstitutional, it would also bring creative industries to a standstill. Contractual disputes are all too common, but the remedy for such disputes is monetary damages awarded against the breaching party. Such

disputes are not grounds to enjoin third parties from publishing First Amendment-protected speech.  Plaintiff's request for a preliminary injunction should be denied.

## I.   THE PRELIMINARY INJUNCTION PLAINTIFF SEEKS IS A CLASSIC UNCONSTITUTIONAL PRIOR RESTRAINT

Plaintiff seeks an order to enjoin Defendants from, in his own words, "broadcasting, distributing, promoting, advertising, licensing, or otherwise disseminating the Lifetime film *Pretty Hurts*, or any portion thereof containing the image, likeness, voice, or performance of Haley Gosserand without the prior written approval of Plaintiff."  ECF No. 6-14.  That is, Plaintiff, in the clearest terms, seeks to stop the airing of a movie.  Granting Plaintiff's requested relief would be a prior restraint.

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n,* 427 U.S. at 559.  Every request for a prior restraint thus comes to a court with "a heavy presumption against its constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also N.Y. Times Co.*, 403 U.S. at 714 (same).  Indeed, "[i]n its nearly two centuries of existence, the Supreme Court has *never* upheld a prior restraint on pure speech."  *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986); *see also* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 173 (2007) ("[N]ever in the [200-plus] year history of the First Amendment has the Supreme Court found it necessary to uphold a prior restraint in a defamation case or any other.").

That has been true for attempts to prevent the publication of the Pentagon Papers, despite government assertions that publication of confidential military secrets could impair national security, *N.Y. Times Co.,* 403 U.S. at 723-24 (Douglas, J., concurring), or attempts to prevent the publication of an anti-Semitic publication that was found to disturb "public peace" and provoke

"assaults and the commission of crime," *Near v. Minnesota*, 283 U.S. 697, 709 (1931). Indeed, the Supreme Court has declared that prior restraints may be justified, if at all, only in the most exceptional circumstances—such as to prevent the publication of the sailing dates of troop ships or the location of soldiers in wartime, *id.* at 716, or to "suppress[] information that would set in motion a nuclear holocaust," *New York Times Co.*, 403 U.S. at 726 (Brennan, J., concurring). *See also Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1979) (White, J., concurring) ("the First Amendment erects a virtually insurmountable barrier" against the issuance of a prior restraint on the media); *People ex rel. Arcara v. Cloud Books, Inc.*, 68 N.Y.2d 553, 558 (1986) (prior restraint unconstitutional under New York law "absent a showing on the record that such expression will immediately and irreparably create public injury").

Although Plaintiff's counsel was provided with prior restraint case law before bringing this case, ECF No. 6-9, Plaintiff all but ignores the constitutional issues inherent in his briefing. Plaintiff disingenuously claims that he is not seeking a prior restraint at all—Defendants are "free to air it," he claims, just not with his former client in it. But that makes no sense at all. First, the relief Plaintiff seeks here is to enjoin the distribution of the Film. *See* ECF No. 16. If Plaintiff's request is granted, Defendants would not be "free to air it." The Film, with Plaintiff's client in it, is locked and ready to distribute on schedule *tomorrow*. If Plaintiff gets his way, Defendants would have to make a whole new movie. Plaintiff's relief, however he wants to frame it, would prohibit Defendants from airing a constitutionally protected work.

Plaintiff does not cite a single case in which a media organization was enjoined from publishing or airing a work because of a violation of someone's publicity rights or some sort of "unjust enrichment." That is because this would be the *first* time such an order would be allowed in this country. Courts *uniformly* hold that such motions are unconstitutional, and this case is no

different. *See, e.g.*, *CBS Inc. v. Davis*, 510 U.S. 1315, 1317-18 (1994) (Blackmun, J., in

chambers) (setting aside state court preliminary injunction against a television network); *Org. for

a Better Austin v. Keefe*, 402 U.S. 415, 418-19 (1971); *New Era Publ'ns Int'l v. Henry Holt &

Co.*, 695 F. Supp. 1493, 1525 (S.D.N.Y. 1988) ("we accept as black letter that an injunction is

not available to suppress defamatory speech"), *aff'd*, 873 F.2d 576 (2d Cir. 1989); *Jordan v.

Metro. Life Ins. Co.*, 280 F. Supp. 2d 104, 111-12 (S.D.N.Y. 2003) (injunction against alleged

defamation "would be unconstitutional as a prior restraint on freedom of expression"); *Diaz v.

NBC Universal, Inc.*, 536 F. Supp. 2d 337, 339 (S.D.N.Y. 2008) (denying injunctive relief to

enjoin the distribution of the movie "American Gangster"), *aff'd*, 337 F. App'x 94 (2d Cir.

2009); *Porco v. Lifetime Entm't Servs., LLC*, 116 A.D.3d 1264, 1266 (3d Dep't 2014) (vacating

TRO enjoining distribution of *Lifetime* movie based on publicity rights); Strom Decl., Ex. 1

(*Morrissey v. A&E Television Networks, LLC* Order) (vacating TRO enjoining distribution of

*Lifetime* movie based on claim that there was no contractual authority to film its subject); Strom

Decl. Ex. 2 (*Brown v. TV One, LLC*, Case No. 17-cv-6824 (S.D.N.Y.), ECF No. 57) (denying

injunction sought based on alleged breach of contract as well as right of publicity and Lanham

Act claims and emphasizing that "[a] preliminary injunction is that much more extraordinary

when it operates as a prior restraint").[2]

---

[2] *See also Meador v. New Times, Inc.*, 36 F.3d 1103 (Table) (9th Cir. 1994) (in case for
defamation and false light, denying injunction as unconstitutional prior restraint); *In re Charlotte
Observer*, 921 F.2d 47, 49 (4th Cir. 1990) (vacating injunctions prohibiting news organizations
from publishing name of attorney as unconstitutional prior restraints); *In re King World Prods.,
Inc.*, 898 F.2d 56, 59 (6th Cir. 1990) (vacating TRO against broadcast of news program as
unconstitutional prior restraint, over claim of invasion of privacy); *Providence Journal Co.*, 820
F.2d at 1350 (vacating TRO against newspaper's publication of certain materials as
unconstitutional prior restraint); *Columbia Broad. Sys., Inc. v. U.S. Dist. Court for Cent. Dist. of
California*, 729 F.2d 1174, 1184 (9th Cir. 1984) (vacating injunction enjoining television
network broadcasting surveillance tapes as a prior restraint); *Goldblum v. Nat'l Broad. Corp.*,
584 F.2d 904, 907 (9th Cir. 1978) (vacating order to produce film for review as a prior restraint);

Simply put, the First Amendment bars Plaintiff from seeking an injunction here. Defendants are not going to telecast troop movements. This is not a case where national security concerns are in jeopardy. It is not even a case involving potential irreparable injury from the disclosure of trade secrets or other confidential information. All that is at issue here is a contract between third parties—a contract that neither Defendant was even aware of at the time the Film was made. The requested injunctive relief should be denied on this basis alone.

## II.    PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION

In addition to its constitutional defects, Plaintiff's motion to prevent the distribution and promotion of the Film must be denied for the separate reason that it fails to satisfy the basic requirements for a preliminary injunction. "A preliminary injunction is an extraordinary remedy" "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). A plaintiff seeking such relief must satisfy every one of the following elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20.

Moreover, where, as here, a plaintiff seeks "a mandatory injunction"—an injunction that "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo"—the burden "is even higher." *Cacchillo v. Insmed,*

---

*A.M.P. v. Hubbard Broad., Inc.*, 216 F. Supp. 2d 933, 933-34 (D. Minn. 2001) (holding that injunction against television network on the grounds of "libel, slander, intrusion upon seclusion, publication of private facts, intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation *per se*" was a prior restraint); *Tilton v. Capital Cities/ABC Inc.*, 827 F. Supp. 674, 682 (N.D. Okla. 1993) (denying injunction against broadcast regarding TV evangelists as prior restraint).

*Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks omitted); *accord Herrick v. Grindr, LLC*, 2017 WL 744605, at *2 (S.D.N.Y. Feb. 24, 2017). "A mandatory preliminary injunction 'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Cacchillo*, 638 F.3d at 406 (citation omitted).

For the reasons discussed below, Plaintiff has not come close to making the required showing.

**A.    Plaintiff Cannot Establish A Likelihood Of Success On The Merits**

There is no claim that allows Plaintiff to recover from the producer and distributor of a movie because he has a contract with one of the actresses in the Film—particularly where no Defendant knew about that contract until *after* the Film was made.  Plaintiff must resolve this matter with Ms. Gosserand.  He has no viable claim against Defendants here.

**1.    New York Does Not Recognize Any "Violation of Contractual Right Of Publicity and Misappropriation of Artist Likeness" Claim**

Plaintiff first brought a claim for a violation of New York's right of publicity, which is exclusively governed by Section 51 of the New York Civil Rights Law, because the Film uses his (former) client's name and likeness.  Once Defendants explained that Plaintiff could not recover under that statute as neither he nor Ms. Gosserand are New York residents, Plaintiff amended his Complaint seeking to vindicate those rights under "New York common law and equity."  ECF No. 18 at 7 n.4.  But Plaintiff is no more likely to succeed under this new theory.

First, New York does not recognize any "publicity rights" outside of Section 51.  *See Pirone v. MacMillan, Inc*., 894 F.2d 579, 586 (2d Cir. 1990) ("New York courts have indicated clearly that the Civil Rights Law preempts any common law right of publicity action"); *Zoll v. Jordache Enterprises, Inc.,* 2002 WL 31873461, at *15 (S.D.N.Y. Dec. 24, 2002) ("numerous

cases under New York law have declined to recognize an independent, common law cause of action in right to privacy or publicity for unauthorized use of an image or likeness") (citing cases).  Plaintiff cannot succeed on his new "common law" publicity claim.

To the extent Plaintiff is trying to enforce his "contractual" rights, those rights are vis-à-vis Ms. Gosserand—not the Defendants.  *See Horowitz v. Spark Energy, Inc.*, 2020 WL 4917180, at *4 (S.D.N.Y. Aug. 21, 2020) ("it is black letter law that non-parties ordinarily cannot be held accountable for a breach of contract" absent limited exceptions such as a parent's complete domination of a subsidiary who was a party to the agreement).  And Plaintiff has not come close to alleging a claim for tortious interference with contract, nor could he.  Plaintiff would have to plead that the Defendants knowingly worked to get Ms. Gosserand to breach her agreement with Plaintiff.  *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) ("Tortious interference with contract requires . . . defendant's knowledge of that contract, [and] defendant's intentional procurement of the third-party's breach of the contract without justification.").  But Plaintiff admits that he did not let the Defendants know about his contract with Ms. Gosserand until earlier this month, *see* ECF No. 18 ¶ 60—and, if Ms. Gosserand breached her agreement at all, it was back in April when she completed her work on the Film, *see* Tomosunas Decl. ¶ 8.  Plaintiff cannot plead that the Defendants knowingly and intentionally induced Ms. Gosserand to breach an agreement whose existence they knew nothing about. Plaintiff is therefore unlikely to succeed on his new theory of "contractual" or "common law" publicity rights.

### 2.    Plaintiff Is Unlikely to Succeed on His Unfair Competition Claim

Plaintiff also has no hope of success on his unfair competition claim.  To plead unfair competition in New York, a plaintiff must show both consumer confusion and bad faith.  *Eyal R.D. Corp. v. Jewelex N.Y. Ltd.*, 784 F. Supp. 2d 441, 449 (S.D.N.Y. 2011); *Jeffrey Milstein v.*

*Greger, Lawlor, Roth Inc.,* 58 F.3d 27, 34-35 (2d Cir. 1995) ("[T]he essence of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods."). The requisite confusion must be to the "origin of the goods," and courts have made clear that this is not pled by claims of confusion as to plaintiff's "involve[ment]" in the creation of a work. *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011).

Plaintiff has not even attempted to allege confusion as to origin. Nor has he alleged the requisite "bad faith" by either of the Defendants. Bad faith requires conduct amounting to "fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001). Yet, as Plaintiff admits, Defendants were not made aware of his contract with Ms. Gosserand until long after the Film had wrapped. ECF No. 18 ¶ 15; *see also* Tomosunas Decl. ¶ 15 & Ex. 3. Plaintiff instead alleges that Swirl Films "had a duty to conduct reasonable diligence to identify existing contractual obligations," and that AETN also "failed to conduct reasonable due diligence before acquiring the distribution rights to Pretty Hurts." ECF No. 18 ¶¶ 53, 58. This purported duty is fantasy, and in any event does not rise to "fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am.*, 280 F.3d at 197. Plaintiff seeks to bolster his deficient claims by citing to two other lawsuits involving Swirl Films, alleging "a persistent pattern of disregard for contractual agreements and publicity rights." ECF No. 18 ¶ 56. But neither of these suits resulted in a judgment in favor of the plaintiffs, and indeed, in *Brown v. TV One*, the Court *denied* a motion for a preliminary injunction for failure to demonstrate likelihood of success. *See* Strom Decl. Ex. 2 at 18. In short, Plaintiff's unfair competition claim fails as a matter of law

17

### 3.      Plaintiff Is Unlikely to Succeed on His Unjust Enrichment Claim

Plaintiff's unjust enrichment claim is equally meritless.  "To prevail on a claim for unjust

enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the

plaintiff's expense; and (3) that equity and good conscience require restitution."  *In re Mid-*

*Island Hosp., Inc.*, 276 F.3d 123, 129 (2d Cir. 2002).  "A plaintiff states an unjust enrichment

claim 'only in unusual situations when, though the defendant has not breached a contract nor

committed a recognized tort, circumstances create an equitable obligation running from the

defendant to the plaintiff.'"  *English v. Danone N. Am. Pub. Benefit Corp.*, 678 F. Supp. 3d 529,

540 (S.D.N.Y. 2023) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)).

Even if Plaintiff could satisfy the first two prongs—which he cannot, because Defendants

were not enriched by Mr. Roane's inability to weigh in on Ms. Gosserand's appearance in the

Film—Plaintiff certainly cannot show this is the "unusual situation[]" where equity and good

conscience require restitution.  Defendants knew nothing about Mr. Roane before they made the

Film with Ms. Gosserand and owe him nothing.  As with unfair competition, one of the

hallmarks of an unjust enrichment claim is that the Defendants acted fraudulently or tortiously.

*See, e.g.*, *Hassan v. Fordham University*, 533 F. Supp. 3d 164, 169 (S.D.N.Y. 2021); *Amable v.*

*New Sch.*, 2022 WL 1443352, at *11 n.8 (S.D.N.Y. May 6, 2022); *see also Paramount Film*

*Distr. Corp. v. State*, 30 N.Y.2d 415, 421 (1972) ("Generally, courts will look to see . . . whether

the defendant's conduct was tortious or fraudulent.").  Plaintiff pleads nothing of the kind.  TBP

Films worked with an actress who represented under her contract with them that she was free to

work on the Film—and even promised to indemnify TBP Films if that was not true.  That actress

came to them with her own agent (not Plaintiff), and neither TBP Films (or Swirl Films) nor

AETN had any reason to believe that a musical manager would claim he had to approve his

client appearing in the Film.  There is nothing fraudulent, unfair, or even tortious about

18

Defendants' conduct.  Thus, on the unfair competition claim, too, Plaintiff is far from likely to succeed on his claim.

### B.    Plaintiff Cannot Demonstrate Irreparable Injury

Plaintiff also fails to make the required clear showing that he likely will suffer irreparable harm in the absence of an injunction.  A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction."  *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citations omitted).  The moving party "must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Id.*; *see also Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (same).  Furthermore, the harm must be "imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages."  *Reuters*, 903 F.2d at 907 (citations omitted).

Here, it is hard to see how Mr. Roane could be damaged at all by having a client appear in a *Lifetime* movie.  Most managers would be pleased by that exposure.  But, if Mr. Roane is able to demonstrate even a plausible chance of prevailing on the merits of his claims, which is highly unlikely, he can obtain money damages.  *See, e.g.*, *Metro. Opera Ass'n v. Local 100*, 239 F.3d 172, 177 (2d Cir. 2001) (holding that "injunctions are limited to rights that are without an adequate remedy at law," and that "equity will not enjoin" conduct that "may be remedied by damages"); *Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 244 (S.D.N.Y. 1990), *aff'd without op.*, 923 F.2d 845 (2d Cir. 1990) ("[T]he classic remedy for breach of contract is an action at law for damages. If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law.").

In addition, when assessing irreparable harm, courts consider the plaintiff's delay in seeking relief. "[A] preliminary injunction implies an urgent need for speedy action to protect the plaintiffs' rights. Delay therefore indicates an absence of the kind of irreparable harm required to support a preliminary injunction." *Insurance Co. of the State of Pennsylvania v. Lakeshore Toltest JV, LLC*, 2015 WL 8488579, at *3 (S.D.N.Y. Nov. 30, 2015) (citing *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985)) (internal quotations omitted). "[E]ven a relatively brief delay may be too long." *Id.* Here, for three weeks, Plaintiff believed his rights had been violated. While his counsel sent legal threats, Plaintiff understood that Defendants were not changing their position. *See* ECF No. 18 ¶ 30. Yet Plaintiff did not seek this Court's intervention until four days before the Film was set to premiere, by which time it has become extraordinarily difficult to pull the Film from Lifetime's schedule and ensure that it is not released on demand. Plaintiff's delay undercuts his claim of urgency and weighs against any finding of irreparable harm.

Plaintiff's failure to demonstrate irreparable injury dooms his request for a preliminary injunction.

## C.    The Balance of Hardships Weighs Heavily In Favor of Defendants

Injunctive relief should be denied also because the harm to Defendants that would result from issuance of the requested injunction—a restraint on its right to produce and distribute First Amendment-protected speech—far outweighs the harm to Plaintiff if the Film airs.

First, a preliminary injunction in this matter would deprive Defendants of their First Amendment rights by enjoining the publication of constitutionally protected speech. "The first amendment informs us that the damage resulting from a prior restraint—even a prior restraint of the shortest duration—is extraordinarily grave." *Columbia Broad. Sys., Inc.*, 729 F.2d at 1177; *see also In re King World Prod'ns*, 898 F.2d at 60 (a prior restraint "by . . . definition, has an

immediate and irreversible sanction") (citations omitted).  Indeed, "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury."  *Elrod*, 427 U.S. at 373; *see also Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110,

126-27 (2d Cir. 2006) ("[e]ach passing day may constitute a separate and cognizable

infringement of the First Amendment"  and "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury") (internal citations and

quotations omitted).

Second, as detailed in the declarations accompanying this opposition brief, AETN and

Swirl Films have been working on the Film, and the publicity for the Film, since December

2024.  They would suffer severe economic and reputational hardship if they were enjoined from

airing the Film as scheduled.  The Supreme Court has recognized that a publisher's:

> control of first public distribution implicates not only his personal interest in
> creative control but his property interest in exploitation of prepublication rights,
> which are valuable in themselves and serve as a valuable adjunct to publicity and
> marketing. *See Belushi v. Woodward,* 598 F. Supp. 36 (D.C. 1984) (successful
> marketing depends on coordination of serialization and release to public); Marks,
> Subsidiary Rights and Permissions, in What Happens in Book Publishing 230 (C.
> Grannis ed. 1967) (exploitation of subsidiary rights is necessary to financial
> success of new books).

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 555 (1985).  For this reason,

courts recognize that a media defendant "would face tremendous hardship if it were subjected to

an injunction" stopping the distribution of a show because the production company would "lose

payments, subject it to liability for lost advertising revenues, and injure its reputation in the

industry."  *Arenas v. Shed Media U.S. Inc.,* 881 F. Supp. 2d 1181, 1195 (C.D. Cal. 2011).

Here, an injunction, even a temporary one, would require Defendants to reschedule the

Film to a later date on less than a day's notice, forcing Defendants to expend additional costs and

upending the careful publicity and marketing campaign they have executed.  O'Donovan Decl.

¶ 11.  Defendants also would suffer untold reputational injuries if they were not able to follow through on their commitments to air the Film as planned this weekend.  Tomosunas Decl. ¶ 28; *see also* Cruz Decl. ¶¶ 9-13; O'Donovan Decl. ¶¶ 9-11.  As a result, the equities weigh strongly against issuance of a preliminary injunction.

### D.    The Public Interest Strongly Favors Defendants

The public interest also weighs heavily against an injunction in this case.  The Supreme Court has properly cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted).  Here, in addition to curtailing Defendants' First Amendment rights, an injunction would limit the public's access to speech on a matter of significant public interest.  *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information.").

Plaintiff tries to ignore the fact that he is attempting to prevent the distribution of an expressive work—a movie—claiming that Defendants are "free to air the Film," just not with his client in it.  But that claim flies in the face of the relief he is seeking—to stop the distribution of the Film.  No matter what Plaintiff wants to call his requested relief, it is a prior restraint, and his request to enjoin the distribution of the Film should be rejected.

### CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff any form of injunctive relief in this action.

Dated: June 27, 2025

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: */s/ Rachel F. Strom*
    Rachel F. Strom
    Abigail Everdell
    Alexandra Perloff-Giles
    1251 Avenue of the Americas, 21st Floor
    New York, NY 10020
    Telephone:  (212) 603-6455
    Fax:  (212) 489-8340
    RachelStrom@dwt.com
    AbigailEverdell@dwt.com
    AlexandraPerloffGiles@dwt.com

    *Counsel for Defendants*

## **CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATIONS**

I hereby certify that the word count of this memorandum of law complies with the word limits of Local Civil Rule 7.1(c). According to the word-processing system used to prepare this memorandum of law, the total word count for all printed text exclusive of the material omitted under Local Civil Rule 7.1(c) is 7,059 words.

I certify under penalty of perjury that the foregoing is true and correct.


Dated: June 27, 2025
New York, NY                                   */s/ Rachel Strom*_____
                                               Rachel Strom